# In the United States Court of Federal Claims

No. 13-232C

(Filed: July 18, 2014)

| | | |
|---|---|---|
| ************************************** | ) | Patent case; discovery dispute; |
| | ) | attorney-client privilege; work-product |
| **CAMERON LANNING CORMACK,** | ) | protection; claw-back request; RCFC |
| | ) | 26(b)(5)(B); Fed. R. Evid. 502(b); |
| **Plaintiff,** | ) | compelled production of documents |
| | ) | from an affiliated nonparty foreign |
| **v.** | ) | corporate entity that joined with the |
| | ) | party in development of the allegedly |
| **UNITED STATES,** | ) | infringing product; discovery related to |
| | ) | nonaccused products |
| **Defendant,** | ) | |
| **and** | ) | |
| | ) | |
| **NORTHROP GRUMMAN SYS. CORP.** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |
| ************************************** | ) | |

James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, for plaintiff. With him on the briefs were Jeffrey S. Pollack and Samuel W. Apicelli, Duane Morris LLP, Philadelphia, Pennsylvania, Anthony J. Fitzpatrick, Duane Morris LLP, Boston, Massachusetts, and Rodney R. Sweetland and Christopher J. Tyson, Duane Morris LLP, Washington, D.C.

Kirby W. Lee, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him were Stuart F. Delery, Assistant Attorney General, Civil Division, and John Fargo, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Scott Bolden, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Michael F. Kiely, United States Postal Service, Washington, D.C.

Gregory H. Lantier, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for defendant-intervenor.

## OPINION AND ORDER

LETTOW, Judge.

In this patent case, plaintiff, Cameron Lanning Cormack ("Mr. Cormack"), filed a motion to compel discovery responses from defendant-intervenor, Northrop Grumman Systems

Corporation ("Northrop Grumman Systems" or "Systems"), pursuant to Rule 37 of the Rules of the Court of Federal Claims ("RCFC").  *See* Pl.'s Mot. to Compel Discovery Responses from Def.-Intervenor ("Pl.'s Mot. to Compel"), ECF No. 37.  During briefing related to this motion, Systems filed a motion for leave to file a sur-reply.  Def.-Intervenor's Mot. for Leave to File Sur-Reply, ECF No. 45.  In his responsive brief, Mr. Cormack used a document produced by Northrop Grumman Systems to support his opposition.  *See* Pl.'s Resp. in Opp'n to Def.-Intervenor's Mot. for Leave to File Sur-Reply in Further Opp'n to Pl.'s Mot. to Compel ("Pl.'s Opp'n to Def.-Intervenor's Mot. for Sur-Reply"), ECF No. 47.  Systems promptly asserted that this document was subject to the attorney-client privilege and work-product protection, requested claw-back of the document, and filed a motion to strike Mr. Cormack's brief incorporating the disputed document.  *See* Def.-Intervenor's Emergency Mot. to Strike Pl.'s Resp. to Mot. for Leave to File Sur-Reply ("Def.-Intervenor's Mot. to Strike"), ECF No. 48.  That motion was also briefed, and a hearing on the related motions was held on June 19, 2014.

## BACKGROUND

On April 3, 2013, Mr. Cormack filed his complaint in this court, alleging that the United States Postal Service ("Postal Service") engaged in an unlicensed procurement and authorization of manufacture and use of patented inventions, a claim arising under 28 U.S.C. § 1498.  Compl. ¶¶ 2, 3.[1]  In August 2010, Mr. Cormack had been granted United States Patent No. 7,781,693 ("the '693 Patent"), entitled "Method and System for Sorting Incoming Mail."  Compl. ¶ 6. Mr. Cormack alleged that the Postal Service infringed this patent when it contracted with Northrop Grumman Systems for the manufacture and delivery of Flats Sequencing Systems ("FSS"), a mail sorting device.  Compl. ¶¶ 8-9, 32.  Mr. Cormack further averred that, pursuant to the contract, Northrop Grumman Systems actually manufactured and delivered 102 such machines and that the Postal Service continues to use them. Compl. ¶¶ 13, 15, 28.

Shortly after Mr. Cormack filed his complaint, the court granted the government's unopposed motion to notify Northrop Grumman Systems as an interested party pursuant to

---

[1]In pertinent part, 28 U.S.C. § 1498 provides:

> Whenever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same, the owner's remedy shall be by action against the United States in the United States Court of Federal Claims for the recovery of his reasonable and entire compensation for such use and manufacture. . . .  For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the [g]overnment and with the authorization or consent of the [g]overnment, shall be construed as use or manufacture for the United States.

28 U.S.C. § 1498(a).

RCFC 14(b).  Order of May 29, 2013, ECF No. 8.  The government advised the court that its contract with Northrop Grumman Systems contains an indemnity clause whereby Systems is obligated to indemnify the government against liability for patent infringement.  Def.'s Unopposed Mot. for Rule 14 Notice at 2, ECF No. 6.  Subsequently, Northrop Grumman Systems filed a motion to intervene as a defendant-intervenor, ECF No. 13, which this court granted the same day, Order of June 24, 2013, ECF No. 16.

## I.  CLAW-BACK REQUEST

During briefing related to Mr. Cormack's motion to compel discovery responses, Mr. Cormack filed a brief attaching an exhibit ("Exhibit 3") which contained an e-mail from an employee of Northrop Grumman Systems to another employee of Systems who was designated in the e-mail as working in the Law Department but was not identified as an in-house counsel. *See* Pl.'s Opp'n to Def.-Intervenor's Mot. for Sur-Reply Ex. 3.  The e-mail was dated approximately one month after the commencement of this case, but prior to Systems's intervention.  *Id.*  Its subject line read "Some [I]nformation for FSS Patent Infringement."  *Id.*  Upon receiving Mr. Cormack's brief, Systems's counsel realized Systems had mistakenly produced the e-mail.  He informed Mr. Cormack's counsel the morning after receiving the filing that he believed Exhibit 3 constituted privileged information and asked Mr. Cormack's counsel to return or destroy all copies of the exhibit, citing RCFC 26(b)(5)(B).  *See* Def.-Intervenor's Reply in Support of Mot. to Strike Pl.'s Resp. to Mot. for Leave to File Sur-Reply ("Def.-Intervenor's Reply in Support of Mot. to Strike") Ex. 1 (Decl. of Gregory H. Lantier), ¶¶ 11-12, ECF No. 55.  Upon receiving the request, Mr. Cormack's counsel ceased reviewing the exhibit and destroyed all copies save one, which he sequestered.  *See* Pl.'s Opp'n to Def.-Intervenor's Emergency Mot. to Strike Resp. to Mot. for Leave to File Sur-Reply ("Pl.'s Opp'n to Def.-Intervenor's Mot. to Strike") at 1 n.1, ECF No. 53.

On June 16, 2014, four days after Exhibit 3 was filed, Northrop Grumman Systems submitted a motion to strike the response by Mr. Cormack that included the e-mail as an exhibit.  Def.-Intervenor's Mot. to Strike; Def.-Intervenor's Mem. in Support of its Mot. to Strike ("Def.-Intervenor's Mem. Supporting Mot. to Strike"), ECF No. 49.  Systems sought to claw back the e-mail and to have Exhibit 3 and the responsive brief containing it stricken from the record.  Def.-Intervenor's Mem. Supporting Mot. to Strike at 1-2.  Plaintiff resisted this motion, noting that RCFC 26(b)(5)(B) explicitly permits the court to view the pertinent document under seal and contesting the applicability of the attorney-client privilege or the work-product protection to the exhibit.  *See* Pl.'s Opp'n to Def.-Intervenor's Mot. to Strike at 1-10.  Plaintiff also contended that Northrop Grumman Systems waived any applicable privilege or protection by not taking reasonable steps to prevent disclosure, as required by Fed. R. Evid. 502(b).  *Id.* at 4-6, 8.  Systems countered that it had taken reasonable steps to prevent disclosure, and its counsel submitted a sworn declaration describing the measures it took in that regard.  Def.-Intervenor's Reply in Support of Mot. to Strike at 3 & Ex. 1.  Systems emphasized that it notified plaintiff's counsel of the mistaken disclosure within hours of discovering it.  *Id.* at 4.

### A. Attorney-Client Privilege

Claims of privilege are governed by the principles of the "common law as [] interpreted by United States courts in the light of reason and experience." Fed. R. Evid. 501. The attorney-client privilege "protects the confidentiality of communications between attorney and client *made for the purpose of obtaining legal advice.*" *Genentech, Inc. v. United States Int'l Trade Comm'n*, 122 F.3d 1409, 1415 (Fed. Cir. 1997) (emphasis added). The privilege exists to "encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). The Supreme Court in *Upjohn* reasoned that attorney-client privilege applies equally to both in-house and outside counsel. 449 U.S. at 389-90. At issue here is whether the e-mail in question revealed a confidential communication, that is, a communication made to an attorney for the purpose of receiving legal advice. *See United States v. United Shoe Mach. Corp.*, 89 F. Supp. 357, 358 (D. Mass. 1950) (Wyzanski, J.), *disapproved in other respects by American Standard Inc. v. Pfizer, Inc.*, 828 F.2d 734, 745-46 (Fed. Cir. 1987). In *Upjohn*, information sent from the company employees to the in-house counsel "was needed to supply a basis for legal advice concerning compliance." 449 U.S. at 394. Counsel was trying to determine what illegal acts had potentially been committed and how best to defend the company. *Id.* That is not the circumstance at hand here.

In the e-mail in question, the employee provided the in-house counsel with information regarding the location of certain documents at the apparent request of counsel. Pl.'s Opp'n to Def.'s Mot. for Sur-Reply Ex. 3. This is hardly a communication conveying information for the purpose of obtaining legal advice. The e-mail relayed only the physical location of certain documents, information that in-house counsel could not directly use to form the basis of her legal advice for the company. Consequently, the e-mail in question does not fall under the protection of the attorney-client privilege.[2]

### B. Work-Product Doctrine

Although the e-mail is not subject to the attorney-client privilege, it may nonetheless be protected by the work-product doctrine. The work-product doctrine exists to protect against "attempt[s], without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties." *Hickman v. Taylor*, 329 U.S. 495, 510 (1947). RCFC 26(b)(3) codifies the work-product doctrine, stating that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative . . . ." RCFC 26(b)(3). In addressing coverage of the doctrine, this court has previously looked to causation, asking whether a document was created for or in anticipation of litigation to determine whether the document is subject to work-product protection. *See Eden Isle Marina, Inc., v. United States*, 89 Fed. Cl. 480, 497 (2009) ("This court

---

[2]Notably, Northrop Grumman Systems has provided plaintiff with copies of the documents referenced in the e-mail and does not contest that those documents are properly discoverable. Hr'g Tr. 11:16-20 (June 19, 2014).

Further citations to the transcript of the hearing will omit reference to the date.

concurs with the conclusion in *Evergreen Trading, LLC* that the simple causation test is the preferred test.") (citing *Evergreen Trading, LLC ex rel. Nussdorf v. United States*, 80 Fed. Cl. 122, 132-33 (2007)). The work-product doctrine is not absolute, however. "Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had." *Hickman*, 329 U.S. at 511; *see also* RCFC 26(b)(3)(A)(ii) (providing for discoverability of attorney work-product if "the party [seeking the documents] shows that it has substantial need for the materials to prepare its case, and cannot, without undue hardship, obtain their substantial equivalent by other means.").

The critical question here is whether the e-mail at issue reveals Northrop Grumman Systems's in-house counsel's mental processes concerning the litigation or whether it merely transmitted unprivileged facts that might bear on a defense to Mr. Cormack's case. Systems argues that the e-mail was written in preparation for litigation and revealed the in-house counsel's mental processes, identifying information she sought in preparation for consideration of defenses. Def.-Intervenor's Mem. Supporting Mot. to Strike at 3. Mr. Cormack, however, posits that the e-mail "does not contain the mental impressions, conclusions, opinions, advice or direction of counsel. Rather it appears to be nothing more than an internal transmittal of factual information." Pl.'s Opp'n to Def.-Intervenor's Mot. to Strike at 4.

The court concludes that the e-mail reveals a specific request for information made by in-house counsel for Systems apparently for potential use in the FSS patent infringement litigation, on the reasonable assumption that Systems would eventually be involved in the litigation. Although the information revealed is factual in nature, *i.e.,* the location of specific documents, the nature of the request also reveals the in-house counsel's thought processes. *See United States v. Nobles*, 422 U.S. 225, 238 (1975) ("At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); *In re Seagate Tech., LLC*, 497 F.3d 1360,1375 (Fed. Cir. 2007) (acknowledging that both factual work-product and mental process work-product can be protected, but stating that factual work-product is more readily discoverable upon a showing of substantial need and undue hardship). Mr. Cormack has not made a showing of substantial need or undue hardship sufficient to overcome the protections afforded to attorney work-product. *See Hickman*, 329 U.S. at 509. Accordingly, the e-mail is protected under the work-product doctrine.

### C.  Waiver and Claw Back

The protection provided by the work-product doctrine can be waived expressly or by implication. *Eden Isle Marina*, 89 Fed. Cl. at 503-04. Fed. R. Evid. 502(b) sets out the test for determining whether a disclosure implicitly waives the work-product privilege:

> (b) Inadvertent disclosure. When made in a federal proceeding . . . , the disclosure does not operate as a waiver in a state or federal proceeding if:
>> (1) the disclosure is inadvertent;
>> (2) the holder of the privilege or protection took reasonable steps to prevent disclosure; and

      (3) the holder promptly took reasonable steps to rectify the error, including, (if applicable) following Federal Rule of Civil Procedure 26(b)(5)(B).

Fed. R. Evid. 502(b).[3]  Thus, the court must determine whether System's disclosure was inadvertent, whether Systems took reasonable steps to prevent its disclosure, and whether Systems promptly took reasonable steps to rectify the error.  *See Sikorsky Aircraft Corp. v. United States*, 106 Fed. Cl. 571, 584 (2012).

      The e-mail transmission to in-house counsel was mistakenly disclosed, and the question whether the mistake was inadvertent is wrapped up with whether Northrop Grumman Systems took reasonable steps to prevent its disclosure.  *See Silverstein v. Federal Bureau of Prisons*, No. 07-cv-02471-PAB-KMT, 2009 WL 4949959, at *11-*12 (D. Colo. Dec. 14, 2009) (holding that a "mistaken" production was not necessarily inadvertent upon consideration of the particular circumstances of the production); *cf. Heriot v. Byrne*, 257 F.R.D. 645, 658-59 (N.D. Ill. 2009) (considering "the total number of documents reviewed, the procedures to review the documents before they were produced, and the actions of the producing party after discovering that the documents had been  produced" in determining whether a disclosure was inadvertent) (internal citations and quotations omitted).  *But see Coburn Group, LLC v. Whitecap Advisors LLC*, 640 F. Supp. 2d 1032, 1038 (N.D. Ill. 2009) ("In this court's view, the structure of Rule 502 suggests that the analysis under subpart (b)(1) is intended to be much simpler, essentially asking whether the party intended a . . . work-product protected document to be produced or whether the production was a mistake.").  The advisory committee's notes to Fed. R. Evid. 502(b) cite with approval a series of factors courts have used to determine whether an unintentional disclosure is a waiver of privilege, including, "the reasonableness of precautions taken, the time taken to rectify the error, the scope of discovery, the extent of disclosure[,] and the overriding issue of fairness."  Fed. R. Evid. 502 advisory committee's note, explanatory note, Subdivision (b), Revised Nov. 28, 2007 (citing *Lois Sportswear, U.S.A, Inc. v. Levi Strauss & Co.*, 104 F.R.D. 103, 105 (S.D.N.Y. 1985) and *Hartford Fire Ins. Co. v. Garvey*, 109 F.R.D. 323, 332 (N.D. Cal. 1985)).  The note continues, however, by explaining that

      [t]he rule does not explicitly codify [a] test, because it is really a set of non-determinative guidelines that vary from case to case.  The rule is flexible enough to accommodate any of those listed factors.  Other considerations bearing on the reasonableness of a producing party's efforts include the number of documents to be reviewed and the time constraints for production.  Depending on the circumstances, a party that uses advanced analytical software applications and linguistic tools in screening for privilege and work product may be found to have taken "reasonable steps" to prevent inadvertent disclosure.  The implementation of an efficient system of records management before litigation may also be relevant.

---

[3]Fed. R. Evid. 502(a) addresses the consequences of an intentional disclosure of privileged material, specifically whether an intentional disclosure serves as a broader subject-matter waiver.

Fed. R. Evid. 502 advisory committee's note.  Particularly relevant here are the scope of discovery and the use of advanced analytical software applications in the screening process.  A sworn declaration submitted by Systems's counsel describes the process by which documents produced for discovery were screened through a software application, how the e-mail at issue was placed in a prescreened folder without having been screened, and how it was then produced.  Consequently, the document was produced without ever having been screened.  *See* Def.-Intervenor's Reply in Support of Mot. to Strike Ex. 1.  The mistake was in failing to screen the e-mail before placing it in a folder with other documents that had been screened, and then in producing the documents in the folder without a further screening cross-check.

During the course of discovery for this case, Systems has produced more than one million documents.  Def.-Intervenor's Reply in Support of Mot. to Strike at 3.  The scope of the discovery, the use of advanced software to screen for privilege, and the affidavit describing the numerous steps taken by Systems should have constituted reasonable steps to prevent disclosure.  Nonetheless, that those steps could have been, and in this instance were, bypassed raises a significant issue.  As one court noted, "The reasonableness of preventive steps surely includes both a design and an implementation component.  Theoretical or intended measures may sound sufficient, but failure to implement such measures by reasonable execution could empty an ostensibly valid process of any real efficacy."  *First Tech. Capital, Inc. v. JPMorgan Chase Bank, N.A.*, No. 5:12-CV-289-KSF-REW, 2013 WL 7800409, at *4 (E.D. Ky. Dec. 10, 2013).  In that case, an attorney stated that he had personally reviewed all 1,500 documents that were ultimately produced and had physically separated the documents into separate piles.  *Id.*  For reasons he could not explain, all 1,500 documents were produced, including a number of privileged ones.  *Id.*  The court found that while human review of documents was a good plan, the fact that the attorney attested to only spending an average of 9.84 seconds reviewing each page was an unreasonable application of his generally reasonable method.  *Id.* ("The rapidity of review indicates an unreasonably small temporal component to the process.  The resulting undifferentiated production shows essentially no care in assuring [that] any segregation by [the attorney would] affect[] the materials actually disclosed to [the defendant].")  Thus, the court held that the producing party had waived any claim of privilege over the produced documents.  *Id.* at *5.

This case presents a somewhat similar set of circumstances in that a reasonable plan of review was inadequately implemented, but there are at least two key differences.  In *First Technology*, the reviewing attorney spent an inadequate amount of time reviewing documents.  *First Tech. Capital*, 2013 WL 7800409, at *4.  Here, the screening software was available and, if used, could have identified the pertinent e-mail as potentially protected from disclosure.  Secondly, over a million documents have been produced in this case, as contrasted to only 1,500.  And, the disclosures in this case were made as "part of a larger production which went unnoticed by the producer."  *Galena Street Fund, L.P. v. Wells Fargo Bank, N.A.*, No 12-cv-00587-BNB-KMT, 2014 WL 943115, at *10 (D. Colo. March 20, 2014) (internal quotation marks and citation omitted) (holding that privileged documents produced despite an electronic screening process were inadvertently produced and did not constitute a waiver where only 150 out of 208,000

documents were disputed).[4]  Considering the specific circumstances of this case, the disclosure of Exhibit 3 can properly be considered inadvertent, albeit mistaken, and the court finds that counsel for Northrop Grumman Systems took reasonable steps to prevent its disclosure.

The final question is whether Northrop Grumman Systems "promptly took reasonable steps to rectify the error."  *See* Fed. R. Evid. 502(b)(3).  "The rule does not require the producing party to engage in a post-production review to determine whether any protected communication or information has been produced by mistake.  But the rule does require the producing party to follow up on an obvious indication that a protected communication or information has been produced inadvertently."  Fed. R. Evid. 502(b) advisory committee's note.  Once a party realizes a document has been accidentally produced, "it must assert that privilege with virtual immediacy."  *Sikorsky*, 106 Fed. Cl. at 585.  Here, Systems's counsel notified Mr. Cormack's counsel within hours of receiving the filing containing the e-mail at issue as an exhibit and filed a motion seeking to claw back the document and strike the relevant filing within four days.  Def.-Intervenor's Reply Supporting Mot. to Strike at 4.  Given the alacrity of Systems's response to discovering the mistaken disclosure, this court finds that Systems's counsel acted promptly and therefore did not waive its claim of privilege on those grounds.  *Cf. Sikorsky*, 106 Fed. Cl. at 586 (finding waiver where party asserting privilege waited ten months to assert it); *Eden Isle Marina*, 89 Fed Cl. at 512-13 (finding waiver where party asserting privilege waited seven months to assert it).

Systems asks that the court issue a claw-back order striking the e-mail from the record, requiring counsel for Mr. Cormack to destroy or return his single sequestered copy of the e-mail, and permitting Mr. Cormack's counsel to refile the pertinent submission without reference to the e-mail.  Def.-Intervenor's Mem. Supporting Mot. to Strike at 6-7.  Because the e-mail in question is protected under the work-product doctrine and Systems has not waived that protection, a claw-back order is appropriate.  Pursuant to Fed. R. Evid. 502(b) and RCFC 26(b)(5)(B), Mr. Cormack's counsel must destroy or return the sequestered copy of the e-mail.  The filing containing Exhibit 3 will be stricken from the record, and Mr. Cormack is directed to resubmit that filing without reference to the e-mail.

---

[4]At the hearing, counsel for Northrop Grumman stated that following the discovery of this mistaken disclosure, they reran the privilege screen on all 1,003,000 documents that they have produced, including productions occurring prior to the production that included the exhibit at issue.  Hr'g Tr. 30:1-12.  That screen revealed 31 other privileged or protected documents that were mistakenly produced.  *Id.*  Counsel for Systems said that they are currently investigating the reasons these other documents were produced, and "[i]f need be, we will be submitting – if they challenge the privilege calls on those, we will be submitting affidavits."  Hr'g Tr. 30:16-18.  Counsel for Mr. Cormack asserted that three of the documents subject to this larger claw-back request appear to be from productions that occurred before the production containing Exhibit 3.  Hr'g Tr. 26:8 to 28:9; *see also* Hr'g Exs. 1, 2, which circumstance suggests that procedures put in place to prevent inadvertent disclosure were not fully functional.

## II.  THE MOTION TO COMPEL

### A. *Documents Possessed by Solystic, S.A.S.*

Mr. Cormack has requested that Systems produce documents in the apparent possession of Solystic, S.A.S. ("Solystic"), a wholly owned but indirect French subsidiary of the Northrop Grumman Corporation that designs and develops mail sorting systems and products.  Pl.'s Mem. of Law in Support of Mot. to Compel Discovery Responses ("Pl.'s Mem. Supporting Mot. to Compel") at 4, ECF No. 37-1.[5]  These documents, he contends, are relevant because Northrop Grumman Systems jointly developed the FSS machine with Solystic and incorporated components of Solystic's TOP 2000, an automated flat sorting machine that preceded the FSS, into the FSS.  *Id*.  Moreover, Mr. Cormack argues that Solystic is familiar with his '693 patent because Solystic had to recognize and differentiate its work from the '693 patent to receive its own European method patent for sorting postal items.  *Id*. at 5.[6]  The requested information, he avers, is relevant to his infringement contentions.

Simply stated, the issue is whether Systems can be compelled to produce documents currently in the possession of its parent corporation's foreign indirect subsidiary, a nonparty in this action.  RCFC 34(a) provides that a party may serve a request for production of documents "in the responding party's possession, custody, or control."  RCFC 34(a)(1).[7]  Control is construed broadly, and it "does not require that the party have legal ownership or actual physical possession of the documents at issue, but rather the right, authority, or practical ability to obtain the documents from a nonparty to the action."  *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 286 F.R.D. 288, 292 (E.D. Va. 2012) (internal quotation marks omitted) (quoting *Bush v. Ruth's Chris Steak House, Inc*., 286 F.R.D. 1, 5-6 (D.D.C. 2012)).  In essence, the inquiry is whether the party has access to the nonparty's documents.  *See Gerling Int'l Ins. Co. v. Commissioner*, 839 F.2d 131, 141 (3d Cir. 1988).

---

[5]Solystic is a wholly-owned subsidiary of NGC Denmark ApS, a company organized and existing under the laws of Denmark.  NGC Denmark is 98.7% owned by Northrop Grumman International Holdings, B.V., a company organized and existing under the laws of the Netherlands, and 1.3% owned by Northrop Grumman Overseas Holdings, Inc., a Delaware corporation. Northrop Grumman International Holdings is a wholly-owned subsidiary of Northrop Grumman Overseas Holding, which is a wholly-owned subsidiary of Northrop Grumman Corporation. *See* Hr'g Ex. 3; Def.-Intervenor's Mem. of Law in Opp'n to Pls.' Mot. to Compel Discovery Responses ("Def.-Intervenor's Opp'n to Mot. to Compel") at 12, ECF No. 40.

[6]Solystic holds European Patent No. EP 2225049 A2, titled "Method for Sorting Postal Items Using a Process for Sorting Outputs Dynamic Allocation."  *See* Pl.'s Mem. Supporting Mot. to Compel at 4.  Before this patent was issued, an opposition proceeding required Solystic to confront the '693 patent.  *Id*. at 5.

[7]RCFC 34 is identical to Fed. R. Civ. P. 34.

Mr. Cormack contends that Solystic's documents are within Systems's control. Denominating Systems and Solystic as sister corporations, he argues that common parentage provides Systems with the requisite control to obtain the documents. *See* Pl.'s Reply to Def.-Intervenor's Opp'n to Pl.'s Mot to Compel ("Pl.'s Reply Supporting Mot. to Compel") at 7-8, ECF No. 42.[8]  He further alleges that because Systems and Solystic jointly developed and manufactured the FSS, the court can require Systems to comply with his discovery requests. *Id.* at 9-10 ("Documents produced by [Systems] in discovery demonstrate that Solystic's involvement in the development of the accused device is so fundamental that to shield Solystic from discovery would deprive Mr. Cormack of [necessary] information.").

Systems, however, insists that it does not have the requisite control over or access to the documents.  It first argues that because Solystic is a European corporation, Mr. Cormack must resort to the Hague Convention on the Taking of Evidence Abroad to obtain the requested discovery.  Hr'g Tr. 47:19-25; *see also* Pl.'s Mot. to Compel Ex. Q, at 2.  This argument is unpersuasive.  The Supreme Court has held that the Hague Convention does not provide exclusive or mandatory procedures, and that it need not be a first resort for litigants in the United States seeking discovery from a foreign corporation. *Société Nationale Industrielle Aérospatiale v. United States District Court for the S.D. Iowa*, 482 U.S. 522, 529 (1987).[9]  Accordingly, this court concludes that Mr. Cormack need not proceed via the Hague Convention but may attempt to compel discovery under RCFC 34 and 37.[10]

---

[8]In his initial Motion to Compel, Mr. Cormack inaccurately characterized Solystic as a wholly-owned subsidiary of Systems, arguing that Systems, as the parent corporation, had the requisite control to obtain and produce Solystic's documents.  Pl.'s Mem. Supporting Mot. to Compel at 19.  That is incorrect, even though Systems concedes that both it and Solystic are wholly owned, albeit indirectly in Solystic's case, by Northrop Grumman Corporation. *See* Hr'g Ex. 3.

[9]The Court in *Aérospatiale* explained that although the Hague Convention procedures were adopted to facilitate collection of evidence, they need not be used if they will be unduly time consuming, expensive, or less likely to produce results than other means.  482 U.S. at 542.

[10]Systems also cites a French blocking statute, which contemplates penalties for French individuals who circumvent the Hague Convention and disclose information for use in foreign judicial proceedings.  Pl.'s Mot. to Compel Ex. Q, at 2.  However, "[i]t is well settled that such statutes do not deprive an American court of the power to order a party subject to its jurisdiction to produce evidence even though the act of production may violate that statute." *Aérospatiale*, 482 U.S. at 544 n.29 (citing *Société Internationale Pour Participations Industrielles et Commerciales, S.A. v. Rogers*, 357 U.S. 197, 204-06 (1958)).  The Supreme Court in *Rogers* noted that a trial court "possesses wide discretion to proceed in whatever manner it deems most effective."  357 U.S. at 213.  "In exercising that discretion where . . . a party claims that foreign law prevents disclosure, the [Supreme] Court has called for a 'particularized analysis.'" *Linde v. Arab Bank, PLC*, 706 F.3d 92, 109 (2d Cir. 2013) (quoting *Aérospatiale*, 482 U.S. at 543).  Here, Systems has not endeavored to support such an analysis, and the court accordingly declines to consider a claim that French law bars disclosure.

Systems, alternatively, contends that because it has no ownership interest in Solystic, Mr. Cormack must present evidence akin to that required to pierce the corporate veil or to establish Solystic as an "alter ego" of Systems to establish control and compel production. Def.-Intervenor's Opp'n to Mot. to Compel at 13.  This argument reaches too far.  While an "alter ego" relationship is indicative of control, it is not required for control to be found.  *See, e.g.*, *Gerling*, 839 F.2d at 141 ("The requisite control has been found only where the sister corporation was found to be the alter ego of the litigating entity . . . *or where the litigating corporation had acted with its sister in effecting the transaction giving rise to suit and is litigating on its behalf*." (emphasis added) (internal citations omitted)).  Rather, courts consider a variety of factors when determining whether a party has sufficient control over a nonparty for the purpose of RCFC 34 and 37, including (1) the corporate structure of the party and nonparty; (2) the nonparty's connection to the transaction at issue in the litigation; and (3) the degree that the nonparty will benefit from the outcome of the case.  *See Steele Software Sys. Corp. v. DataQuick Info. Sys., Inc*., 237 F.R.D. 561, 564-65 (D. Md. 2006); *Afros S.P.A. v. Krauss-Maffei Corp*., 113 F.R.D. 127, 130 (D. Del. 1986).  Here, Mr. Cormack argues that both the corporate structure of Systems and Solystic and Solystic's involvement in the development of the FSS support a finding of control.

The first factor, corporate structure, can be dispositive of control when a parent corporation is the party to the lawsuit, and the moving party seeks discovery of the parent's wholly-owned subsidiary.  *See Gerling*, 839 F.2d at 140.[11]  In other situations, however, corporate structure may not be dispositive, and the moving party must point to additional factors indicative of control before production can be compelled.  *See Uniden*, 181 F.R.D. at 307 (compelling production of documents from a party's sister corporation where additional indicia of control were present).  Because Systems does not own Solystic, and the ultimate parent of both, Northrop Grumman Corporation, is not a party to this litigation, corporate structure is not dispositive of control.

Where evidence beyond corporate structure is required, courts look particularly to the nonparty's connection to the transaction at issue and the degree that the nonparty will benefit from the outcome of the case.  *Steele Software*, 237 F.R.D. at 565.  Courts can infer control from mutual involvement in the transaction at issue in the litigation.  *See Costa v. Kerzner Int'l Resorts, Inc.*, 277 F.R.D. 468, 472 (S.D. Fla. 2011) ("Given their established corporate and transactional connections, it is unlikely that [d]efendants [did] not have access to [or an] ability to obtain documents and information in the possession of their . . . [a]ffiliates.").  The moving party may point to the exchange of documents between the related entities in the ordinary course of business, *see Steele Software*, 237 F.R.D. at 564 (citing *Uniden*, 181 F.R.D. at 306), or agreements between the nonparty and the party to support a case for mutual involvement in the

---

[11]Courts often find control where common relationships, such as ownership of the nonparty, overlapping directors, officers, or employees, or financial relationships, bind the party and the nonparty.  For example, some courts hold that litigating parent corporations have control over documents possessed by their wholly-owned subsidiaries. *See Uniden Am. Corp v. Ericsson Inc.*, 181 F.R.D. 302, 305-06 (M.D. N.C. 1998).  Other courts have ruled that parent corporations possess the necessary control when they own more than 50% of their foreign subsidiary's stock. *See In re Uranium Antitrust Litig.*, 480 F. Supp. 1138, 1145 (N.D. Ill. 1979).

transaction at issue in the litigation, *see E.I. DuPont de Nemours*, 286 F.R.D. at 292.  For example, a court found that where a nonparty sister corporation was a "main actor" in the transaction at issue, an inference of control could be drawn from that corporation's having been "inextricably intertwined in the transaction." *In re Global Power Equip. Grp.*, 418 B.R. 833, 844 (Bankr. D. Del. 2004).

Documents of record show that Systems jointly worked with Solystic to develop the key technologies incorporated into the FSS.  *See* Pl.'s Mem. Supporting Mot. to Compel Ex. 4.  In its proposal to the Postal Service, Systems acknowledged that Solystic had previously designed a large portion of the system.  *Id*. Ex. 7, at 3.  The proposal also indicated that Solystic would develop a new generation of "P[rinted ]C[ircuit ]B[oards]" for the FSS, *id.* at 15, and would help Systems design a system complying with a "hiding places" requirement established by the Postal Service, *id.* at 19.  Moreover, Systems, through a subsidiary, Northrop Grumman Overseas Services Corp., entered into a related technology transfer and license agreement with Solystic.  *See* Pl's Opp'n to Def.-Intervenor's Mot. for Sur-Reply Ex. 4.  E-mail communications sent contemporaneously with execution of the agreement reveal that Systems and Solystic were working closely together.  *See id.* Ex. 2.  Among other things, a Consulting Contracts Representative for Systems wrote at one point, "We need to ship the[] parts back for repair to Solystic, our French subsidiary that manufactured them."  *Id.*

Taken together, the recitations in the proposal to the Postal Service, the agreement between Systems and Solystic, and the related e-mails support plaintiff's contention that Systems and Solystic collaborated on the FSS design and show that Solystic was critical to the project.[12] The court finds that this collaboration equips Systems both with access to Solystic's documents and with the requisite power to obtain them, rendering Systems able and required to comply with Mr. Cormack's discovery requests in accordance with an order by the court.

### B. Documents Related to Non-Infringing Products

Mr. Cormack seeks discovery into nonaccused products that fall within his definition of "mail sorting product;" which, as specified, would include both FSS and non-FSS products.  *See* Pl.'s Mem. Supporting Mot. to Compel at 14, 17.  RCFC 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." RCFC 26(b)(1).  This rule should be applied no differently in patent cases than in other types of cases.  *See SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed. Cir. 1985). Mr. Cormack seeks information related to the development and functionality of non-FSS mail sorting products because, "[t]o the extent that these products function in a manner that infringes the '693 Patent and were sold to the [g]overnment, Mr. Cormack would be entitled to amend his [c]omplaint to add those products to this case."  Pl.'s Mem. Supporting Mot. to Compel at 17. Additionally, Mr. Cormack asserts that information related to "non-FSS products that do not practice the method taught by the '693 Patent [is] useful to show the advantages and utility gained through the FSS's use of Mr. Cormack's patented invention," which is relevant for

---

[12]In fact, the proposal lists Solystic as the *only* approved source for certain components of the FSS at the time of Systems's proposal to the Postal Service.  *See* Pl.'s Mem. Supporting Mot. to Compel Ex. 7, at 20.

determining damages in the form of a reasonable royalty.  Pl.'s Mem. Supporting Mot. to
Compel at 17 (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116,
1119-20 (S.D. N.Y. 1970)).  Specifically, Mr. Cormack contends that Systems should be
required to produce documents responsive to Document Request Nos. 3-10, 12-14, 16-19, and
31-32, and to provide a more complete response to Interrogatory No. 12.  *Id.* at 18; *see also* Pl.'s
Mot. to Compel Ex. E (Pl.'s First Set of Requests for Production of Documents and Things to
Northrop Grumman Systems).  These document requests and Interrogatory No. 12 generally seek
detailed information related to the design, development, operation, and licensing of "each and
every Mail Sorting Product and Mail Sorting System." *See, e.g.*, *id.* Ex. E, at 12, ¶¶ 3, 10 ("All
documents and things which relate to or evidence the conception, development and/or design of
each model or series of Mail Sorting Product and Mail Sorting Systems designed, manufactured,
tested, used, or licensed by or for You for The United States of America in the United States in
the time period from January 1, 2003 to the present.").[13]

Northrop Grumman Systems opposes Mr. Cormack's request, stating that "'[n]on-FSS
mail sorting products' – i.e., all [Systems] products *not accused of infringement* in this action –
have little or no relevance to the claims and defenses in this case."  Def.-Intervenor's Opp'n to
Mot. to Compel at 6-7 (emphasis in original).  Systems describes Mr. Cormack's request as "an
unprecedented expansion of the scope of this litigation and . . . highly prejudicial."  *Id.* at 7.

As a preliminary matter, the court cannot accept Northrop Grumman Systems's
characterization of Mr. Cormack's request.  The court does not read Mr. Cormack's document
requests or interrogatories to be requesting "discovery of *all* of [the] company's products that
[have] not been accused of infringement."  Hr'g Tr. 59:7-8 (emphasis added).  That said, the
court finds Mr. Cormack's definition of "Mail Sorting Product" to be overly broad and not
sufficiently tailored to discovery of relevant documents.  In his First Set of Interrogatories,
Mr. Cormack defined "Mail Sorting Product" to mean:

> any product, including without limitation, equipment, hardware
> products, firmware products, or software products, relating to a
> Mail Sorting System, including without limitation, flats sorting
> machine (FSM), flats sorting equipment (FSE), flats sequencing
> system (FSS) equipment, mail sorting machine, mail sorting
> equipment, automatic induction equipment, in-feed equipment,
> image processing equipment, carousel equipment, integrated tray
> converter equipment, electrical components, components of the
> same, combinations of the same, and hardware, firmware or
> software related to the same.

---

[13]Interrogatory No. 12 requests that Northrop Grumman Systems "[i]dentify by Bates
number all patent licenses and other agreements, as well as documents relating to or evidencing
negotiations for a patent license or other agreements, where such documents relate to Mail
Sorting Products and/or Mail Sorting Systems."  Pl.'s Mot. to Compel Ex. D, at 14.

Pl.'s Mot. to Compel Ex. D, ¶ 18 (Pl.'s First Set of Interrogatories to Northrop Grumman Systems).[14]

The other extreme position is equally untenable.  Courts have not required plaintiffs to name specifically the products respecting which they seek discovery to establish their relevance to the patent at issue.  Instead, a plaintiff must "identify those systems and the components, characteristics, or elements allegedly causing infringement with requisite specificity." *Tesseron, Ltd. v. R.R. Donnelley & Sons Co.*, No. 1:06 CV 2909, 2007 WL 2034286, at *1 (N.D. Ohio July 10, 2007).  In summarizing existing precedent, a district court recently explained that "[c]ases that have examined the issue of the discoverability concerning nonaccused products have concluded that the scope of discovery may include products that are 'reasonably similar' to those accused in a party's preliminary infringement chart." *AGA Medical Corp. v. W.L. Gore & Assocs., Inc.*, No. 10-3734, 2011 WL 11023511, at * 7 (D. Minn. Oct. 19, 2011) (permitting discovery into a product closely related in function to the accused product).[15]  In some instances, while recognizing the permissibility of discovery into nonaccused products, courts have required the requesting party to narrow the request.  For example, in *Tessera Inc. v. Sony Elecs., Inc.*, No. 10-0838-RMB-KMW, 2012 U.S. Dist. LEXIS 180771, at *8-*11 (D. Del. Aug. 6, 2012), a magistrate judge determined that the plaintiff's attempts to compel the defendant to identify all of their "multi-chip stacked semiconductor products, and provide information about them" was too broad because it would require production of information related to numerous products that were not alleged to have infringed upon the patent-in-suit.  *Id.*, at *6, *10.  The court directed the plaintiff to narrow the applicable definition of "Your Products" to one limited to a relevant time frame and sufficiently pertinent in function to the alleged infringement of the patents-in-suit.  *Id.*, at *11.

Northrop Grumman Systems relies on a series of decisions in support of its overarching contention that discovery of nonaccused products is disfavored by courts, Def.-Intervenor's Opp'n to Mot. to Compel at 7-8, but these cases are of limited usefulness.[16]  For example, in

---

[14]Northrop Grumman Systems and the government noted that this same definition of mail sorting products and requests for documents were served on the Postal Service.  Hr'g Tr. 46:6-14 ("And the important note here is that arguments that you will hear no doubt from [Northrop Grumman Systems's counsel] will apply even more so to the United States Postal Service, whose business is mail sorting machines and mail sorting devices."); Hr'g Tr. 60:6-8 ("Of course, essentially everything [the Postal Service] own[s] would qualify as a mail sorting product under that definition.").

[15]The early Scheduling Order issued in this case required the parties to identify their infringement contentions and non-infringement, unenforceability, and invalidity contentions by February 14, 2014 and March 28, 2014, respectively.  *See* Scheduling Order of Nov. 14, 2013, ECF No. 33.

[16]*See, e.g.*, *Samsung SDI Co., Ltd. v. Matsushita Elec. Indus. Co., Ltd.*, No. 05-8493-AG, 2007 WL 4302701, at *2-*3 (C.D. Cal. June 27, 2007) (relying heavily on interpretation of a local patent rule in denying a party's motion to compel discovery related to nonaccused products).

*Tesseron*, the court expressly recognized that "a party claiming patent infringement may obtain discovery of unidentified and unaccused systems under certain circumstances," but that the plaintiff had failed to make the required showing in that particular instance.  *Tesseron*, 2007 WL 2034286, at *1; *cf. Biax Corp. v. Nvidia Corp*, 271 F.R.D. 200, 205 (D. Colo. 2010) (denying plaintiff's discovery requests regarding nonaccused products without a "more specific showing of need or relevance.").  Here, Mr. Cormack has specifically pointed to the TOP 2000, produced by Solystic, as being the prototype for the accused FSS machine.  Pl.'s Mem. Supporting Mot. to Compel at 18; *see also* Hr'g Tr. 32:22-25 ("The preprototype platform for the machine that we have at issue in this case was something called the TOP[ ]2000.").  Northrop Grumman Systems has not responded, even in part, to Mr. Cormack's requests to the extent that there are products similar in function to the FSS, such as the TOP 2000.  Information related to the TOP 2000, as a precursor to the FSS machine, is relevant to the determination of whether it or other similar machines infringe upon Mr. Cormack's patent, as well as relevant to the calculation of damages.

In other respects, Mr. Cormack is directed to more narrowly tailor his definition of "mail sorting products" to those reasonably similar in function to the FSS, and Northrop Grumman Systems is directed to respond to the document requests as so amended.[17]  Mr. Cormack should take care to specifically identify the elements or components of a machine that would render it similar in function to the FSS machine and thus potentially infringing on the '693 patent.

### C. Documents Related to Damages

Mr. Cormack alleges that the damages he seeks in this case may be measured using several different well-known methodologies: "(1) cost-savings to the [g]overnment; (2) lost profits; or (3) a reasonable royalty."  Pl.'s Mem. Supporting Mot. to Compel at 2; *see also Georgia-Pacific*, 318 F. Supp. at 1120.  He argues that Northrop Grumman Systems has not "provided full and complete responses to Mr. Cormack's discovery requests, nor has it produced documents related to these three damages theories."   Pl.'s Mem. Supporting Mot. to Compel at 2.  Mr. Cormack seeks information related to "[Systems's] revenues, costs of goods sold, and profits related to the sale of mail sorting systems," *id.* at 6, and information related to the government's cost-savings realized by using the FSS machines as contrasted to human sorters, *id.* at 7.

Northrop Grumman Systems contends that Mr. Cormack's motion to compel documents related to damages is moot because Systems produced over 30,000 pages of such material on the same date that the motion to compel was filed.  *See* Def.-Intervenor's Opp'n to Pl.'s Mot. to Compel at 5-6.  Mr. Cormack concedes that this production resolved certain issues but maintains that it has not rendered the motion to compel wholly moot on this issue.  Pl.'s Mem. Supporting Mot. to Compel at 3-4.  Nonetheless, Mr. Cormack has withdrawn his requests for production seeking documents related to "revenues, costs of goods sold, and profits for FSS," pending Mr.

---

[17]For example, the bar code reader cited by Mr. Cormack's counsel during the hearing on the pending motion, Hr'g Tr. 45:2-4, does not seem sufficiently similar to an FSS-type mail sorting machine to fall within an appropriate definition of "mail sorting product" subject to document requests and interrogatories.

Cormack's review of the produced documents. *Id.* at 3.[18]  The motion to compel remains extant, however, respecting two items.  First, Mr. Cormack seeks production regarding the revenues, costs of goods sold, and profit related to non-FSS mail sorting products and systems sold within the United States. *Id.* at 3-4.  Second, Mr. Cormack maintains that Northrop Grumman Systems's production of documents related to cost-savings to the government resulting from

---

[18]Mr. Cormack has not, however, withdrawn his motion to compel a further response by Systems to a related interrogatory seeking an analysis and summary of the documents provided. Interrogatory No. 16 requests that Northrop Grumman Systems

> [i]dentify separately, for each of the years in the time period between January 1, 2003 and the present for Mail Sorting Systems sold by you in the United States: (1) number of Mail Sorting Systems sold; (2) your gross and net revenues related to the sale of Mail Sorting Systems; (3) your costs of goods sold; and (4) your gross and net profits related to the sale of Mail Sorting Systems, and identify all documents related thereto, including but not limited to documents responsive to Document Requests 117-120.

Pl.'s Mot. to Compel Ex. F, at 10 (Pl.'s Second Set of Interrogatories to Northrop Grumman Systems).

   Systems has provided Mr. Cormack with the number of FSS machines sold to the government and the price paid for them, *i.e.*, the revenues related to the sale of the accused machines.  Hr'g Tr. 56:12-20.  As to gross and net profits and loss, Northrop Grumman Systems explained at the hearing that the FSS contract has been a loss for the company, and "[t]he way in which that loss is calculated greatly depends on how you want to value the different aspects of the work that [Systems] put in."  Hr'g Tr. 56:23-25.  Systems maintains that there is no single document or comprehensive narrative response more readily available to it than to Mr. Cormack. Def.-Intervenor's Sur-Reply in Opp'n to Pl.'s Mot. to Compel Discovery ("Def.-Intervenor's Sur-Reply") at 2.  Northrop Grumman Systems asserts that it has provided all of the data related to the "costs of goods sold" associated with performance of its contract with the Postal Service and further interpretation and analysis of that data will likely be the subject of expert testimony from all parties. *Id.*; *see also* Hr'g Tr. 56:21 to 58:7.  In a related vein, Mr. Cormack complains that Northrop Grumman Systems's response to Interrogatory No. 16 consists of a 50-page list of documents from which he is expected to develop a summary.  Pl.'s Reply Supporting Mot. to Compel at 4.  Systems points to the fact that its contract with the Postal Service is thousands of pages long and contains numerous performance requirements that have shifted over time, and thus the precise costs associated with this contract are not easily culled from the data provided. Hr'g Tr. 57:19-25.  The court cannot compel Northrop Grumman Systems to produce documents or submissions that do not exist.  *See Tech v. United States,* 284 F.R.D. 192, 198 (M.D. Pa. 2012) ("It is clear that the court cannot compel the production of things that do not exist.  Nor can the court compel the creation of evidence by parties who attest that they do not possess the materials sought by an adversary in litigation."); *see also United States v. Capitol Supply, Inc.*, __ F. Supp. 2d __, __, No. 13-mc-0373, 2014 WL 1046006, at *9 (D.D.C. Mar. 19, 2014) (quoting *Tech,* 284 F.R.D. at 198).  In the circumstances, the court has no reason to believe that Systems possesses a readily available narrative responsive to the pertinent interrogatory.

using the FSS is deficient.  *Id.* at 4-5 ("It is inconceivable that [Northrop Grumman Systems] does not possess more documents responsive to this request.").  The court will address each of Mr. Cormack's contentions in turn.

      First, Mr. Cormack, as already discussed, is entitled to discovery of revenues, costs of goods sold, and profits for non-FSS mail sorting machines to the extent that "non-FSS mail sorting machines" is limited to mail sorting machines that are functionally equivalent to the FSS machine, such as a precursor to the FSS.  At the very least, this information would be directly relevant to *Georgia-Pacific* factors 8 and 9, *viz.*, "[t]he established profitability of the product made under the patent; its commercial success; and its current popularity" and "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results," respectively.  *Georgia-Pacific*, 318 F. Supp. at 1120.

      Second, while acknowledging some production responsive to his request for documents related to cost-savings for the government, Mr. Cormack avers that more responsive documents must be in Systems's possession.  Pl.'s Reply Supporting Mot. to Compel at 4-5.  Systems's production consists of four documents, all originally created by the Postal Service, related to cost-savings to the government.  *Id.*  In support of the contention that more documents must exist, Mr. Cormack points to the ongoing breach-of-contract suit pending in this court between the United States and Northrop Grumman Systems related to the same FSS contract at issue in this case.  Pl.'s Mem. Supporting Mot. to Compel at 13-14.  In that case, the Postal Service is seeking reimbursement for cost-savings it did not realize due to delayed delivery of the FSS machines by Northrop Grumman Systems.  *See* Answer to First Am. Compl. & Counterclaim ¶ 50, *Northrop Grumman Systems Corp. v. United States*, No. 12-286 (Fed. Cl. Nov. 26, 2012), ECF No. 15.  In Mr. Cormack's view, because cost-savings are at the heart of the government's counterclaim against Northrop Grumman Systems in that suit, Systems must possess more documents related to projected government cost-savings.  *See* Pl.'s Mem. Supporting Mot. to Compel at 5.  Systems counters that the government's projected cost-savings were calculated by the government and Northrop Grumman Systems has no responsive documents other than those already produced.  Def.-Intervenor's Sur-Reply at 2-3.

      At the hearing, counsel for Systems reiterated that no other responsive documents exist and that Mr. Cormack is mistaken in believing that Northrop Grumman Systems ever produced marketing materials intended to convince the Postal Service of the cost-savings it could realize by use of FSS machines.  Hr'g Tr. 55:8-23.  He explained that the contract with the Postal Service was a fixed-price government contract.  "The [Postal Service] was the one who identified the need.  Northrop [Grumman Systems] did not have to sell the [Postal Service] on the idea that the FSS would be a beneficial device to have.  What [Systems] had to do was competitively bid on the contract, and it won it, and it had to fulfill it."  Hr'g Tr. 55:14-19.  Second, counsel has represented that the Postal Service made the statements regarding cost-savings, and Systems asked the Postal Service how it arrived at the amount of alleged cost savings.  Hr'g Tr. 55:8-14.  In response, Systems received the four documents that it has produced to Mr. Cormack.  *Id.*  The court cannot compel Northrop Grumman Systems to produce

documents that it insists do not exist.  Mr. Cormack's motion to compel is denied as to this issue.[19]

## CONCLUSION

For the reasons stated, Northrop Grumman Systems's motion to strike Mr. Cormack's response to its motion for leave to file a sur-reply is GRANTED.[20]  Mr. Cormack's counsel is directed to refile his response without reference to Exhibit 3.  He is further directed to return or destroy the one remaining copy of Exhibit 3 that he has sequestered.

Mr. Cormack's motion to compel is GRANTED IN PART and DENIED IN PART.  The motion to compel is GRANTED insofar as Northrop Grumman Systems is directed to produce documents in the possession of Solystic that relate to the FSS and other mail sorting machines that have a function similar to the FSS, such as the TOP 2000.  Northrop Grumman Systems is also directed to produce documents related to nonaccused products to the extent they are encompassed by a revised and narrowed definition of "mail sorting product."  The motion to compel is DENIED insofar as Mr. Cormack seeks further documents or interrogatory responses related to the "profits" or "costs of goods sold" for FSS products or related to the government's projected cost-savings by use of the FSS.

It is so **ORDERED**.


s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[19]The court notes that this subject may be a proper matter for deposition testimony by a designee of Systems pursuant to RCFC 30(b)(6).

[20]Systems's motion for leave to file a sur-reply is also GRANTED.