# In the United States Court of Federal Claims
No. 13-232C

(Filed Under Seal: August 18, 2015)
(Reissued: August 26, 2015)

| | | |
|---|---|---|
| ************************************* | ) | Patent case; defendants' motion |
| | ) | for summary judgment on grounds |
| **CAMERON LANNING CORMACK,** | ) | of non-infringement |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| and | ) | |
| | ) | |
| **NORTHROP GRUMMAN SYS. CORP.,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |
| ************************************* | | |

James L. Beausoleil, Jr., Duane Morris LLP, Philadelphia, Pennsylvania, for plaintiff. With him at the hearing was Michael G. McManus, Duane Morris LLP, Washington, D.C. With him on the briefs and at the hearing were Jeffrey S. Pollack, Duane Morris LLP, Philadelphia, Pennsylvania, and Patrick D. McPherson and Kristina Caggiano Kelly, Duane Morris LLP, Washington, D.C.

Scott Bolden, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs were Stuart F. Delery, Assistant Attorney General, Civil Division, Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, John Fargo, Director, Commercial Litigation Branch, Civil Division, and Stephen M. Chong, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and Michael F. Kiely, United States Postal Service, Washington, D.C.

Gregory H. Lantier, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C., for defendant-intervenor. With him at the hearing were Todd Zubler and Brittany Amadi, Wilmer Cutler Pickering Hale and Dorr LLP, Washington, D.C.

**OPINION AND ORDER**[1]

LETTOW, Judge.

  This case concerns U.S. Patent No. 7,781,693 ("the '693 patent"), entitled "Method and System for Sorting Incoming Mail." Plaintiff, Mr. Cameron Lanning Cormack, alleges that the United States, through the United States Postal Service ("Postal Service" or "Service"), has infringed claims 1-5, 9-13, and 19 of the '693 patent and is therefore liable for damages under 28 U.S.C. § 1498(a).[2] Compl. at 2.[3] Mr. Cormack claims that the Postal Service infringed the '693 patent by contracting with Northrop Grumman Systems Corporation ("Northrop Grumman Systems") for the manufacture and delivery of mail sorting devices called Flats Sequencing Systems ("FSS"). Compl. ¶¶ 8-9, 32. Mr. Cormack specifically alleges that Northrop Grumman Systems has manufactured and delivered 102 FSS machines to the Postal Service pursuant to the contract, and the Service continues to use those machines. Compl. ¶¶ 13, 15, 28. Pending before the court is the defendants' motion for summary judgment pursuant to RCFC 56. *See* Def. United States of America and Def.-Intervenor Northrop Grumman Systems Co.'s Mem. of Law in Support of Their Mot. for Summary Judgment ("Defs.' Mot."), ECF No. 82. Defendants aver that the allegedly infringing FSS machine used by the Postal Service fundamentally differs from the invention described and claimed in the '693 patent for two reasons: (1) it is incapable of performing "sortation in a single pass" as described in the '693 patent and interpreted by the court in its claim construction; and (2) unlike the '693 patent, which requires the depositing of mailpieces into "receiving bins," which periodically empty if and when new unassigned mailstops are identified, the FSS deposits mail into structures that are only

---

[1] Because this opinion and order might have contained confidential information within the meaning of Rule 26(c)(1)(G) of the Rules of the Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this opinion and order and to provide proposed redactions. No redactions were requested.

[2] In pertinent part, Subsection 1498(a) of Title 28 provides:

> Whenever an invention described in and covered by a patent of the
> United States is used or manufactured by or for the United States
> without license of the owner thereof or lawful right to use
> or manufacture the same, the owner's remedy shall be by action
> against the United States in the United States Court of Federal
> Claims for the recovery of his reasonable and entire compensation
> for such use and manufacture.

28 U.S.C. § 1498(a).

[3] The patent application was filed and granted before the effective date of the Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 (2011). The court in considering the issues in this case relies upon the applicable law at the time of issuance. *See Tobinick v. Olmarker*, 753 F.3d 1220, 1223 n.1 (Fed. Cir. 2014).

emptied when full. *Id.* at 1. Plaintiff opposes this motion, arguing that the FSS is capable of achieving sortation in a single pass because the first "pass" of the mail through the FSS is actually a "sequencing primer." Pl. Cameron Lanning Cormack's Mem. of Law in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Opp'n") at 1, ECF No. 85. Additionally, plaintiff argues that the FSS deposits mail into structures that qualify as "receiving bins" as interpreted by the court pursuant to its claim construction. *See id*. at 2.

For the reasons stated below, defendants' motion for summary judgment is granted.

## BACKGROUND

The invention at issue is a method and system for sorting incoming mail in a "single pass." Compl. ¶ 5-6; Pl.'s Opp'n at 1. Mr. Cormack alleges that he invented a system that improved traditional single-pass automatic mail sorting systems by incorporating technology that allows for the dynamic assignment of mailstops and receiving bins, reducing the number of receiving bins required by the system. *See* Pl.'s Opening Claim Construction Br. ("Pl.'s Claim Construction Br.") at 8-9, ECF No. 66; *see also* Compl. ¶ 5, 7. Mr. Cormack's invention was primarily intended for use at institutions including universities and other similar entities that receive large amounts of incoming mail. *See* Defs.' Opening Claim Construction Br. ("Defs.' Claim Construction Br.") at 6-7, ECF No. 65.

### A. *The '693 Patent*

The '693 patent was issued to Mr. Cormack on August 24, 2010. Compl. ¶ 6. It incorporates both method and system claims for automated mail sorting, particularly with respect to incoming mail. *See* '693 patent, col. 1, lines 6-9, ECF No. 65-2 ("The invention disclosed herein relates generally to methods and systems for automated mail sorting and, more particularly, methods and systems for the automated sorting of incoming mail."); *see also* '693 patent, col. 1, line 55-58 ("It is . . . desirable to provide a mail sorting method and system having the ability to sort incoming mailpieces using a single pass process with fewer receiving bins than the number of mailstops being sorted."). The method and system achieve sortation in a single pass. A noted advantage of Mr. Cormack's invention over prior art was that it employed a dynamic process that enabled receiving bins periodically to be emptied and reassigned while the mail was being sorted. '693 patent, col. 2, lines 20-49. Accordingly, Mr. Cormack's invention required fewer receiving bins than mailstops, allowing it to take advantage of a reduced footprint and lower cost than a "multi-pass" system. '693 patent, col. 1, lines 44-48. It also enabled relatively fast speed and reduced wear and tear compared to a multi-pass system. '693 patent, col. 1, lines 49-54; *see also* '693 patent, col. 1, lines 26-30 ("The requirement for a large number of receiving bins increases the cost of [single-pass] machines. These machines also have very large footprints when outfitted with a substantial number of receiving bins.").[4]

---

[4]Automated mail sorting has existed for over 100 years. *See* Defs.' Claim Construction Br. at 2. The original automated mail sorting systems—so-called traditional single-pass systems—deposited mailpieces into individual bins, each of which corresponded to a particular sorting destination. Pl.'s Opp'n at 5 (citing Pl.'s Opp'n Ex. 1 (Decl. of Edward Cohen (May 19, 2015))). Eventually, as mail volumes and the number of sorting destinations increased, the

B. *The Flat Sequencing System*

The accused mail sorting system is called the "Flats Sequencing System." "Flats" refers to the "oversized mailpieces, such as magazines, catalogues, and advertisements" that the FSS sorts. Defs.' Mot. at 3.[5] "Sequencing" refers to the "delivery point sequence" type of sortation that the system performs. *Id.*[6] Finally, "system" refers to the physical arrangement employed, which comprises several subsystems, including the Flats Sorting Machine, the "Stand-Alone Mail Prep," and the Automated Trail Management System. *Id.* at 4. The FSS physically measures over a football field in length. *Id.*

In the early 2000s, Northrup Grumman Systems entered negotiations to provide automated mail sorting systems to the Postal Service, culminating in the entry of the parties into

---

number of sorting destinations began to exceed the number of bins that feasibly could be incorporated into a sortation system. *See id.* Accordingly, adaptations were developed. *See id.* One adaptation was the development of methods for manually or automatically emptying or replacing bins as they became full. *See id.* Another adaptation enabled the system to split the sorting algorithm across multiple passes of mail through the machine. *See id.*; *see also* Defs.' Claim Construction Br. at 5. Sortation in multiple passes was generally achieved in one of two ways: (1) separating mail into "genera" and then reloading the mail into the sorting machine and "run[ning] a new sorting algorithm to sort the genus into species" or (2) assigning mailstops to each available bin until the machine ran out of bins and then collecting the overflow output for reloading and reprocessing until all of the mail was sorted. Pl.'s Opp'n at 5-6. The machines that achieve sortation by splitting the sortation across multiple passes of mail are traditionally referred to as "multi-pass" systems. *See id.* at 6.

[5]"Flats" differ from letter-sized mailpieces because they are more varied in size and other characteristics, *i.e.*, "envelopes vs. open magazines and plastic wrapped magazines, single flyers vs. loose sheets and bound pages, etc." Defs.' Mot. Ex. 16, at 5 (FSS Concept of Operations (Mar. 15, 2006)). Flats accordingly must be processed by a more complicated system, "featuring multiple feeders and larger outputs." *Id.*

[6]Delivery Point Sequence processing sorts the mail not only by carrier but also by mailstop order for each carrier "such that the flats for the carrier's first delivery point on his or her route will be at the top of the stack, the flats for the second delivery point will be immediately underneath, et cetera." Defs.' Mot. at 3-4. A delivery point is a place where mail is to be delivered, such as "a particular house or a particular business address." Hr'g Tr. 10:11-12 (Aug. 3, 2015). In the past, the Postal Service operated machines that sorted mail solely based on carrier. *See* Pl.'s Opp'n at 6 (citing *id.* Ex. 1). Mail carriers received a bundle containing mail in no particular sequence and "therefore needed to [manually] arrange the mail within their bundles to correspond to the sequence of stops along their route prior to leaving for their delivery, or they would need to dig around within the bundle to find the mail for each stop as they arrived." *Id.* at 6-7 (citing Pl.'s Opp'n Ex. 2, at 19-20 (Dep. of Leung Shiu (Apr. 22, 2015))). Delivery point sequence sortation saved man-hours by automatically organizing each carrier's bundle sequentially. *Id.* at 7.

4

Contract No. 3AAFLT-07-B-0004 (the "FSS contract") on February 23, 2007.  Compl. ¶ 8. During their initial negotiations, the parties planned to include single-pass functionality in addition to two-pass Delivery Point Sequence processing as part of the FSS contract.  *See* Defs.' Mot. Ex. 8, at 3373 (FSS Production Statement of Work Section D Technical Design Description (Apr. 2008)) ("The Supplier shall design and provide the FSS as a fully automated system for sorting mail under two methods, Delivery Point Sequence (DPS) and single[-]pass Non-DPS. For the DPS method, the FSS must be a fully automated two[-]pass operation . . . ."); *see also id.* at 3385 ("The FSS must be designed to operate in the following modes: two[-]pass Delivery Point Sequencing (DPS) operation and single[-]pass non-DPS operation.").  However, during negotiations, the requirement of single-pass functionality was removed from the contract and single-pass functionality was never designed or implemented.  *See id.* Ex. 7, at 4083 (revised Section 1.1 of FSS contract) ("The Supplier shall design and provide the FSS as a fully automated system for sorting mail under a *two-pass* Delivery Point Sequence (DPS) method.") (emphasis added); *see also id.* at 7; Hr'g Tr. 17:2 to 18:7 (Aug. 3, 2015).[7]  As a result, Northrup Grumman Systems developed the FSS to sort mail exclusively by Delivery Point Sequence processing.  *See* Defs.' Mot. at 7.

      Delivery Point Sequence processing requires mail to be processed twice.  *See* Defs.' Mot. at 7.  As the system is currently used by the Postal Service, during the first pass, mailpieces are sorted by "stop group."  *See id.* at 5-6.  "A 'stop group' is one of the 'stops' on every mail carrier's route.  Thus, 'stop group 1' comprises the first stops on all of the mail carriers' routes (*e.g.*, the first house that each of the carriers will reach on each of their respective routes).  'Stop group 2' comprises the second stops on all of the mail carriers' routes . . . and so forth."  *Id.* at 5. Accordingly, after the completion of the initial pass, each group contains the intermingled mail for "dozens of addresses – *e.g.*, the mail for *all* of the first houses of *all* of the mail carriers' routes."  *Id.* at 6 (emphasis in original).  The mailpieces are then reloaded in reverse order such that "the first stop group to be loaded is the stop group for the *last* stops on all mail carriers' routes (*e.g.*, the last houses that the carriers will reach on their respective routes)," and the mailpieces are run through the system again.  *Id.* (emphasis in original).  During the second pass, the mail is sorted according to mail carrier until all of the stop groups have been processed.  *Id.* Once sorting is complete, the mail is ordered in "delivery point sequence" for each carrier, meaning that "the mail destined for the first stop on that carrier's route is on top, the mail destined for the second stop is immediately underneath, and so forth . . . ."  *Id.* at 6-7.

---

[7]Further citations to the transcript of the hearing held on August 3, 2015 will omit reference to the date.

5

The primary physical components of the FSS include two input lines[8] and a sorting carousel conveyor with 360 sorter output bins.[9] *See* Defs.' Mot. at 9 & n.4.[10] Mail enters the system through one of the two input lines, where it is scanned. *See id*. at 9. The mailpieces are then carried inside one of three angled slots of a bucket-like container on the carousel conveyor from the input line over one of 90 output bins into which the mailpieces will be deposited. *See id*. at 8-9 (citing *id*. Ex. 1, at 1806 (FSS Plant Supervisor/In-Plant Support Specialist User Guide (May 19, 2011)). Each output bin consists of a single rigid blue plastic tray with an open top that is held in place by a series of parallel rails that act to transport the blue plastic trays. *See id.* at 9-10.[11] The System Controller tracks each mailpiece as it travels down the conveyor in the carousel bucket. *See id*. at 12 (citing *id*. Ex. 1, at 1806). Once a carousel bucket carrying a mailpiece reaches its designated output bin, the bucket slot containing the mailpiece opens and the mail drops into the blue plastic tray below. *See id*. at 11-12 & Ex. 13, at 6345 (FSS Phase II Maintenance Training Student Training Manual) ("As the mail passes its destination output bin, the bucket flap opens to place the mailpiece into a [blue plastic tray]."). Each blue plastic tray is marked with an individual bar code that is permanently affixed to the tray, which enables the FSS to keep track of where each blue plastic tray is located in the system. *See* Hr'g Tr. 45:18 to 46:25. If the blue plastic tray becomes full, the relevant place-and-transfer device removes the full blue plastic tray and replaces it with an empty one. *See* Defs.' Mot. at 12-13 (citing *id*. Ex. 14 (photograph of place-and-transfer device)). The full blue plastic tray is moved along a separate conveyor to a staging area, where it remains "until all the mail has been fed for the pass and has dropped into the output bins." *Id.* at 14 (quoting *id*. Ex. 15, at 4810 (Software Design Description for FSS) (Feb. 16, 2011)) (emphasis omitted); *id*. Ex. 1, at 1807. After all of the mailpieces have completed their second pass, the blue plastic trays are taken to a staging area where the flats are removed and "combined to create full street trays, and placed vertically into street trays with the bindings to the right." *Id*. Ex. 1, at 1807. The various FSS components are depicted in the photographs shown below:

---

[8]Each input line contains two mail feeders, one camera, a labeler, a printer, and a "[v]erifier." *See* Defs.' Mot at 9.

[9]180 outputs are served by the upper input line and 180 are served by the lower input line. Defs.' Mot. Ex. 4, at 142 (FSS Sort Controller Module).

[10]The relevant physical components are controlled by a separate executable software application which runs on an Intel-based processor board under control of the VxWorks operating system. Defs.' Mot. Ex. 4, at 142.

[11]There is no surface beneath the blue plastic trays "and there is nothing in front of or behind" the blue plastic trays. Defs.' Mot. at 11.



Defs.' Mot. Ex. 10 (photograph of rails, blue plastic bins, and conveyor buckets).



Defs.' Mot. Ex. 3 (photograph of blue plastic trays below conveyor buckets).



Defs.' Mot. Ex. 14 (photograph of place-and-transfer device).

## PROCEDURAL HISTORY

Mr. Cormack filed his complaint in this court on April 3, 2013. On June 24, 2013, Northrup Grumman Systems filed a Motion to Intervene pursuant to RCFC 14 and RCFC 24 on the grounds that its contract with the Postal Service contained an indemnity clause specifying that it was obligated to indemnify the United States against liability for patent infringement. Northrop Grumman Systems Co.'s Mot. to Intervene, ECF No. 13. On that same day, the court granted Northrop Grumman Systems' motion. Order of June 24, 2013, ECF No. 16; *see also Cormack v. United States*, 117 Fed. Cl. 392, 396 (2014) ("*Cormack I*") (addressing discovery disputes).[12]

After explication by the parties of issues and defenses, and completion of some discovery, the parties submitted briefs on claim construction and presented oral arguments at a *Markman* hearing held on August 27, 2014. The court subsequently issued its claim construction opinion on November 4, 2014. *See Cormack v. United States*, 119 Fed. Cl. 63 (2014) ("*Cormack III*").

On February 13, 2015, defendants filed their motion for summary judgment of non-infringement. *See* Defs.' Mot. Plaintiff filed his response on May 19, 2015. *See* Pl.'s Opp'n.

---

[12]A subsequent opinion addressed discovery of documents claimed to be protected by the attorney-client privilege against disclosure. *See Cormack v United States*, 118 Fed. Cl. 39 (2014) ("*Cormack II*").

On June 19, 2015, defendants filed their reply to plaintiff's response. *See* Def. United States of America and Def.-Intervenor Northrop Grumman Systems Co.'s Reply Br. in Support of Their Mot. for Summary Judgment ("Defs.' Reply"), ECF No. 88. Plaintiffs filed a sur-reply on June 30, 2015, *see* Pl. Cameron Lanning Cormack's Unopposed Sur-Reply in Opp'n to Defs.' Mot. for Summary Judgment ("Pl.'s Surreply"), ECF No. 89-1, and defendants filed a rejoinder on July 9, 2015, *see* Def. United States of America and Def.-Intervenor Northrop Grumman Systems Co.'s Response to Pl.'s Sur-Reply in Support of Their Mot. for Summary Judgment, ECF No. 91-1. A hearing on defendants' motion was held on August 3, 2015. Accordingly, the matters before the court are fully briefed and ready for disposition.

**STANDARDS FOR DECISION**

A. *A Claim Pursuant to 28 U.S.C. § 1498(a)*

Pursuant to 28 U.S.C. § 1498, the United States has waived sovereign immunity and granted this court exclusive jurisdiction to adjudicate patent infringement claims against the federal government "[w]henever an invention described in and covered by a patent of the United States is used or manufactured by or for the United States without license of the owner thereof or lawful right to use or manufacture the same." 28 U.S.C. § 1498(a); *see also Martin v. United States*, 99 Fed. Cl. 627, 632-33 (2011) (recognizing that Section 1498, rather than the Tucker Act, 28 U.S.C. § 1491(a), grants this court jurisdiction over patent infringement claims against the United States). Moreover, the statute additionally provides that "the *use or manufacture* of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the [g]overnment and with the authorization or consent of the [g]overnment, shall be construed as use or manufacture for the United States." 28 U.S.C. § 1498(a) (emphasis added). Such an unauthorized "use or manufacture of an invention" under Section 1498(a) is analogous to a taking of property under the Fifth Amendment of the United States Constitution. *See Motorola, Inc. v. United States*, 729 F.2d 765, 768 (Fed. Cir. 1984); *see also Hughes Aircraft Co. v. United States*, 29 Fed. Cl. 197, 208 (1993). The government's "taking" of a non-exclusive and compulsory license to any United States patent occurs "as of the instant the invention is first used or manufactured by [or for] the [g]overnment." *Decca Ltd. v. United State*s, 640 F.2d 1156, 1166 (Ct. Cl. 1980); *see also Liberty Ammunition, Inc. v. United States*, 119 Fed. Cl. 368, 385 (2014), *appeals pending*, Nos. 15-5057, 15-5061 (Fed. Cir.).

The government has waived sovereign immunity only for the compulsory taking of a non-exclusive patent license, and the government's liability under 28 U.S.C. § 1498 diverges from private liability under 35 U.S.C. § 271:

> Government liability under Section 1498 arises from the "use[ ] or manufacture[ ] by or for the United States." There is no mention of liability for a "sale" to the United States of a device covered by a patent. In contrast, with respect to private liability for patent

9

> infringement, the "sale" of a patented device is specifically defined in 35 U.S.C. § 271 as an act of infringement . . . .[13]

*de Graffenried v. United States*, 25 Cl. Ct. 209, 215 (1992) (alteration in original); *compare* 28 U.S.C. § 1498, *with* 35 U.S.C. § 271.

### B.  *Patent Infringement*

"The court determines whether the government has engaged in direct infringement [of a patent] using a two-step process that parallels the analysis for infringement litigation between private parties." *Liberty Ammunition*, 119 Fed. Cl. at 385 (citing *Lemelson v. United States*, 752 F.2d 1538, 1548 (Fed. Cir. 1985)); *Casler v. United States*, 15 Cl. Ct. 717, 731 (1988), *aff'd*, 883 F.2d 1026 (Fed. Cir. 1989). First, the court construes the claims of the patent; then, it compares those claims to the characteristics of the accused product or process. *See JVW Enters. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1329 (Fed. Cir. 2005). When comparing the patent claims to the accused device or process, the plaintiff bears the burden of proving by a preponderance of the evidence that *every limitation* set forth in a patent claim is present in the accused device or process either literally or by a substantial equivalent. *See Boeing Co. v. United States*, 69 Fed. Cl. 397, 426 (2006) ("'[E]ach element of a claim is material and essential, and . . . for a court to find infringement, the plaintiff must show the presence of every element [for literal infringement] or its substantial equivalent [for infringement under the doctrine of equivalents] in the accused device.'") (alteration in original) (quoting *Lemelson*, 752 F.2d at 1551). The plaintiff's failure to meet even one element within a claim, literally or by its substantial equivalent, negates a finding of infringement. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991). This standard is commonly referred to as the "all elements" rule. *See TDM Am., LLC v. United States*, 92 Fed. Cl. 761, 768 (2010), *aff'd*, 471 Fed. Appx. 903 (Fed. Cir. 2012); *see also Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997).

### C.  *Summary Judgment*

A grant of summary judgment is appropriate when the pleadings, affidavits, and evidentiary materials filed in a case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if it might "return a verdict for the nonmoving party." *Id*. If "the record taken as a whole [cannot] lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial,'" and summary

---

[13]Section 271 of Title 35 of the United States Code provides in relevant part:

> (a) . . . whoever without authority *makes, uses, offers to sell, or sells* any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a) (emphasis added).

judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288 (1968)).

The burden of demonstrating the absence of any genuine dispute is on the moving party *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Accordingly, "'the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion.'" *Matsushita*, 475 U.S. at 587-88 (alteration in original) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The non-moving party may defeat summary judgment by presenting material facts of its own, more than "[m]ere denials or conclusory statements," that indicate "an evidentiary conflict created on the record." *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 836 (Fed. Cir. 1984). To establish "that a fact cannot be or is genuinely disputed," a party must "cite[] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

## ANALYSIS

### A. *Sortation in a Single Pass*

Defendants first argue that summary judgment of no infringement is appropriate with regard to both the method and system claims contained in the '693 patent because the FSS employs a two-pass method of mail sortation and is incapable of sorting mail in a single pass. *See* Defs.' Mot. at 19.[14] According to defendants, mailpieces sorted by the FSS are always loaded and processed twice and the FSS contains no software that would allow the mailpieces to be sorted in one pass. *See* Defs.' Reply at 1-2.

Plaintiff does not challenge defendants' factual depiction of the structure and operation of the FSS machinery, nor does he dispute that the FSS interacts with every mailpiece twice. *See* Pl.'s Opp'n at 7 ("The FS[S] interacts with the mail twice."). However, he avers that the FSS machines nonetheless infringe the '693 patent because the first pass performed by the machine "is not mail sortation in the traditional sense (the sense in which the patent describes mail sortation)," *id.*, because it "does not contribute to sorting flats *by carrier route sorting destination*," *id*. at 2 (emphasis added).[15] Instead, plaintiff classifies the initial pass of mail through the FSS as "a sequencing primer." *Id*. at 1. In plaintiff's view, the purpose of the initial pass is not to sort but rather to use a "pre-sort sequencing process . . . to cause the individual mailpieces within each pass two sorting destination to enter the stream of mail for pass two in

---

[14]"Where it appears in Claims 1 and 10, 'single pass' refers to a process rather than to a device or apparatus. As applied generally in the '693 patent, it appears that 'single pass' refers to the number of times that mail is loaded and processed, *i.e.*, once." *Cormack III*, 119 Fed. Cl. at 69.

[15]Plaintiff avers, "[t]he purpose of mail sorting is to segregate the mail by destination (such as *carrier route*), such that all of the mail for a particular destination is collected in one place." Pl.'s Opp'n at 4-5 (emphasis added).

11

delivery point sequence." *Id.* at 2; *see also* Hr'g Tr. 52:14-16 ("Sortation is grouping like with like; sequencing is ordering within a group. Sortation and sequencing achieve different results.").[16] Therefore, "the so-called 'pass two' of the FSS operation is actually a single-pass sort operation . . . [that] performs all of the steps of the patented method in a single pass, and fully achieves sortation by carrier route sorting destination in that single pass." Pl.'s Opp'n at 2.[17]

The parties' dispute arises from their different interpretations of the term "single pass sortation" and inconsistent accounts of the capabilities of the FSS machinery. In its claim construction, the court considered the meaning of "sorting in a single pass" when it construed separately the pertinent terms, *i.e.*, "a method for sorting mailpieces in a single pass" in Claim 1 and "a system for sorting mailpieces in a single pass" in Claim 10 of the '693 patent. *See Cormack III*, 119 Fed. Cl. at 71. The court interpreted "a method for sorting mailpieces in a single pass" to mean "a method that achieves sortation in one pass, without reloading and reprocessing mailpieces." *Id.* The court determined "a system for sorting mailpieces in a single pass" to mean "a system that *can* perform all of the subsequently recited steps in one pass of mail through the system." *Id.* (emphasis added). While the court observed that the constructions "conceptually are very similar," it also cautioned that the terms are "not identical" and "the context of the two types of claims requires a modicum of differentiation." *Id.* at 71-72. Specifically, while for the method claim, the mail *must* be sorted in a single pass, for a system claim, the mail sortation system need only *be capable* of achieving sortation in a single pass. *Id.* The court reasoned as follows:

> While a distinguishing characteristic of the system [described in the '693 patent] is that it is capable of employing a "single pass" process, another central feature is the incorporation of a "fewer number of receiving bins than [the] required [number of] sort destinations." '693 patent, col. 2, lines 2-3. . . . Nothing in Claim 10 or the specification bars, or suggests a prohibition on, removing mailpieces from a receiving bin and reprocessing them through the sorting apparatus. *See* Pl.'s [Claim Construction] Br. at 6-7. Among other things, Claim 10 does not preclude use of a continuous conveyor system, '693 patent, col. 5, lines 3-15, or organization of the mail by criteria other than mailstop, or programming the system with different tasks, '693 patent, col. 4, lines 48-52. These alternatives to a traditional, pure one-pass system are specifically

---

[16]In support of his position, plaintiff compares the sequencing of mail to other tasks that may be incorporated into automated mail sorting systems that are distinct from sortation, including "weighing mail, . . . separating incoming from outgoing mail, or verifying sufficient postage." Pl.'s Opp'n at 8.

[17]Plaintiff further suggests the FSS cannot be considered a multi-pass system because unlike multi-pass systems, which "achieve[] a partly usable sortation in each pass," Pl.'s Opp'n at 2, the FSS operates such that "'[a]fter the completion of pass 1, [the mail is] not in an order that is even partly usable on the street,'" *id.* (quoting Defs.' Mot. Ex. 6, at 756978 (Module 2 Postal Operations Mail Delivery Point Sequence (Nov. 2013)), and the mailpieces "are no closer to being sorted than they were before [the first pass]," *id.* at 7.

> contemplated by the patent. . . . The open-ended structure of Claim 10 permits the claimed system to be modified to perform prior or subsequent tasks that may involve additional mail processing.

*Id.* at 71.

Respecting the method claims contained in the '693 patent, defendants prevail on their assertion of no infringement because under the court's interpretation, the FSS does not employ a method for sorting mailpieces in a single pass. As the government observes, the difference in the parties' positions is fundamentally semantic. *See* Defs.' Reply at 6; *see also* Pl.'s Opp'n at 16 ("Defendants' characterization of their delivery point sequencing process as a two-pass *sort* is merely an imprecision in language.") (emphasis in original); Hr'g Tr. 8:19-24 ("The disputes between the parties are purely semantic, and I say that not in a pejorative way but to say they really relate to what is the scope of the claims under the [c]ourt's claim construction. There's not a dispute about what is in the system or how it operates."). Both parties have acknowledged that the FSS as currently programmed processes each mailpiece twice. *See, e.g.*, Pl.'s Opp'n at 17 ("Both passes are necessary to achieve both sortation by carrier route and sequencing within each sorted stack . . . .").[18] During the first pass, the mailpieces are scanned, transported along a conveyor system, and dropped into the appropriate blue plastic trays, ordered by mailstop for all the relevant carriers. After the pass is completed, the mailpieces are reloaded in reverse order into the system, after which they are again scanned, transported along the same conveyor system, and ejected into blue plastic trays, this time ordered by carrier. Mailpieces are processed by one criteria—mailstop order—during the first pass and by another category—individual mail carrier—in the second pass. It is plaintiff's contention that the first pass should not count as sortation because "[i]t is not grouping like mailstops together and separating unlike mailstops, as every other mail sorting machine in history has done" and results in mailpieces being "deposited into a given receiving bin [that] are not necessarily going to the same destination." *Id.* at 16. However, merely because the FSS differs from traditional mail sorting systems in that it sorts to delivery point sequence for each mail carrier rather than only by mail carrier does not mean that it infringes the method depicted in the '693 patent.[19] Unlike the other tasks identified by plaintiff and contemplated by the court as being distinct from sortation and yet capable of being incorporated into mail sorting systems, *see id.* at 8 ("weighing mail, . . . separating incoming from outgoing mail, or verifying sufficient postage"), the singular goal of the FSS is to sort mail to delivery point sequence, *see* Hr'g Tr. 29:2-10. In achieving this form of sortation, the method

---

[18]An exception applies to "[u]naddressed saturation mail" which "can be processed on the FSS by introducing it into the sequenced mail stream on Pass 2, resulting in only one piece-handling for that mail." Defs.' Mot. Ex. 20, at 685214 (FSS System Operating Description (Mar. 22, 2005)).

[19]Plaintiff observes in support of his position that "sequencing the mail within each sorted stack is not necessary per se." Pl.'s Opp'n at 17. However, plaintiff's observation merely underscores that the method contained in the '693 patent and that used by FSS were developed to achieve different goals: the former, to sort mailpieces to each mail carrier, and the latter to sort to delivery point sequence for each carrier.

13

used by the FSS requires mail to pass through the system multiple times. Therefore, the FSS cannot be said to employ "a method that achieves sortation in one pass, without reloading and reprocessing mailpieces." *Cormack III*, 119 Fed. Cl. at 71.[20]

Regarding the system claim in Claim 10 of the '693 patent, the relevant question becomes whether the FSS system is *capable* of sorting mail in a single pass. *See Cormack III*, 119 Fed. Cl. at 71. Based on the facts presented, defendants also prevail on their assertion of no infringement of Claim 10 because for the FSS to qualify as "a particular scheme or assemblage of apparatus and set of algorithms that achieve sortation in one pass," *id*. at 69, it would have to be physically altered or reprogrammed. As currently configured, the FSS acts not unlike the multi-pass systems described and distinguished in the '693 patent. *See* Decl. of Douglas Quine (July 20, 2014)) ("Quine Decl.") ¶ 24, ECF No. 65-1;[21] Defs.' Reply Ex. 1 (U.S. Patent No. 5,119,954), col. 2, lines 43-48 ("In a two-pass system, the [system] will use the first pass of mail to distribute mail pieces in such a manner that when the mail is processed through a second pass, and each sort stacker (containing mail from the first pass) is processed in sequence, the mail will be in the proper delivery sequence."); Defs.' Reply Ex. 2 (U.S. Patent No. 5,363,971), col. 1, lines 10-13 & col. 12, lines 12-15 (describing a "machine . . . for sorting mail which is capable of sequencing an individual's mail carrier's mail to each individual route stop" where "[t]he device . . . uses a three-pass system"). As plaintiff acknowledges, a physical reconfiguration would be

---

[20]Plaintiff avers "[i]f pass two were performed alone—without pass one being performed at all—the exact same sortation by carrier route would be achieved [by the FSS] at the end of pass two." Pl.'s Opp'n at 13. However, this is inaccurate because the FSS was specifically programmed to sort by mail carrier only *after* the mail has already been organized during pass one based on each mailpieces' respective sequential position within every mail carrier's route and reloaded into the apparatus in reverse order. *See*, *e.g.*, Defs.' Reply Ex. 3, at 78:20 to 79:7 (Dep. of Cathryne Tondreau (Mar. 19, 2015)) (noting that if mailpieces were run through the FSS solely on the second pass they would be rejected by the system because they would not be in the sequence list); *see also* Defs.' Mot. Exs. 8, at 993373 ("For the single pass Non-DPS mode, the system must be configurable to output [blue plastic trays] to a spur line accessible to operators to manually transfer contents of the [blue plastic trays] to [Postal Service] flat mail trays.") & 19, at 408810-11 (Software Design Description for FSS (Oct. 31, 2007)) (cataloguing information stored by system on each pass)); Hr'g Tr. 31:23-24 ("[I]n actual operation, the FSS will not process a piece of mail during pass two unless it remembers having processed it during pass one."); Hr'g Tr. 34:23 to 35:2 ("[I]f a piece of mail comes in [during the second pass] that is assigned to the same mail carrier but isn't for the house that's being sorted at that time, it will have to be rejected. It won't be put in the stack.").

[21]The court in its claim construction considered portions of Dr. Quine's declaration to provide a generic background about mail sorting systems. *See Cormack III*, 119 Fed. Cl. at 69 n.8 ("[T]he court has accepted the portions of Dr. Quine's Declaration that provide a historical background in mail sorting technology, *see* Quine Decl. ¶¶ 14-48, and the court has considered that background in its claim construction analysis. Those portions of Dr. Quine's declaration provide a review of the state of the art at the time the '693 patent was filed, engendering no objection from Mr. Cormack.") (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1585 (Fed. Cir. 1996))).

required for the FSS to shift from sorting by delivery point sequence in multiple passes to sorting by mail carrier in one pass. *See* Pl.'s Opp'n at 20 ("Whether the FSS was to be used for (a) sorting *and* sequencing or (b) just sorting would affect the architecture of the building housing the machine, the layout of additional equipment, employee training procedures, and allocation of resources to mail processing facilities . . . [due to] the fact that sequencing involves reverse tray ordering, which uses a[n] [additional] subsystem.") (emphasis in original).

Moreover, even if physical alterations of the FSS's mechanical components were not necessary to achieve single-pass sortation, the Postal Service nonetheless "is not currently running programming" in which it "perform[s] all of the operations of [C]laim 10 in one pass of mail through the system." Pl.'s Opp'n at 20. Indeed, Northrup Grumman Systems and the Postal Service explicitly agreed to exclude single-pass functionality when drafting the FSS contract, and programming for that purpose was never developed. *See* Hr'g Tr. 17:2 to 18:7; *see also* Pl.'s Opp'n at 19 ("Ultimately the [Postal Service] dropped the requirement for the sorting-only mode . . . [which] reflects the fact that the [Postal Service] decided not to include a standalone sortation mode among the standard operator settings.").[22] "[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) (finding no infringement where an accused product could not directly place international calls, a claim limitation in the relevant patent, without modification of the system by employing an outside carrier) (citing *High Tech Med. Instrumentation v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995)).

In *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339 (Fed. Cir. 2014), the Federal Circuit addressed the relevance of the ability to install new software to achieve a claimed functionality. In that case, the court held that the accused products did not infringe where a modification in the form of the installation of new software was required for the allegedly infringing system to be capable of performing certain claim limitations. *Id.* at 1345-46 (citing *Silicon Graphics, Inc. v. ATI Technologies, Inc.*, 607 F.3d 784, 794 (Fed. Cir. 2010)). Here also, as in *Nazomi Communications*, the programming that would allow the FSS to complete sortation in one pass is "not even present" in the system. *Id.* at 1346; *cf. Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204-05 (Fed. Cir. 2010) (finding jury verdict of infringement was based on legally sufficient evidentiary basis where code for proactive scanning, a feature of the relevant patent, was "already present" in defendants' accused products when sold and required no modification of underlying code); *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1118 (Fed. Cir. 2002) (addressing a circumstance where a user had to activate the

---

[22]Plaintiff avers that "[t]here is no reason an operator could not program the FS[S] to run in a standalone pass the sort plan that typically runs during pass two." Pl.'s Opp'n at 19. Nonetheless, plaintiff has failed to provide any evidentiary support for this proposition or any explanation as to how an operator would configure the FSS's extant settings to enable this function. In addition, plaintiff identifies the predecessor to the FSS, "the AFSM 100 . . . [as] a sorting machine that does not sequence mail," and observes that "Postal [S]ervice employees looked into adding a sequencing functionality to that machine, but decided to leave it as a standalone sorter." *Id.* at 19-20. However, the FSS, not the AFSM 100, is the system at issue in this case.

functions programmed into a piece of software by selecting certain options).  Accordingly, the FSS does not qualify as "a system for sorting mailpieces in a single pass" under Claim 10 of the '693 patent.  *Cormack III*, 119 Fed. Cl. at 71.

　　　　Plaintiff also raises an argument of infringement under the doctrine of equivalents.  Pl.'s Opp'n at 14.  The doctrine of equivalents provides that "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."  *Warner-Jenkinson*, 520 U.S at 21 (quoting *Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 609 (1950)).  The doctrine of equivalents can establish infringement where "the differences between [an element of an accused product and a claim limitation] are insubstantial, a question that turns on whether the element of the accused product 'performs substantially the same function in substantially the same way to obtain the same result' as the claim limitation."  *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1139-40 (Fed. Cir. 2011) (quoting *Graver Tank*, 339 U.S. at 608); *see also Telemac Cellular*, 247 F.3d at 1331.

　　　　The FSS's method and system do not infringe Claims 1 and 10 of the '693 patent under the doctrine of equivalents because the FSS neither performs substantially the same function nor obtains substantially the same result as Mr. Cormack's invention.  First, the FSS sorts in multiple passes, whereas the '693 patent describes a single-pass method and system and explicitly disparages systems that require multiple passes.  *See, e.g.*, '693 patent, col. 1, lines 49-58; *see also Honeywell Int'l, Inc. v. ITT Indus.*, 452 F.3d 1312, 1321 (Fed. Cir. 2006) (finding no infringement under the doctrine of equivalents where accused devices contained carbon fibers, which were disavowed from the scope of the a claim limitation); *J&M Corp. v. Harley-Davidson, Inc.*, 269 F.3d 1360, 1366 (Fed. Cir. 2001) ("[T]he scope of equivalents may be limited by the prosecution history. . . . [or] by statements in the specification that disclaim coverage of certain subject matter.") (citations omitted).  Therefore, to reach a finding of equivalents, the court would have to ignore the single-pass limitations of Claims 1 and 10, an aspect central to plaintiff's invention.  Moreover, the process employed by the FSS and the process described in the '693 patent exist to achieve different results; while the FSS was designed to sort mail by delivery point sequence, the invention outlined in the '693 patent intended to sort mail by mail carrier or destination.

　　　　Defendants therefore have sufficiently demonstrated that there is no infringement of Claims 1 and 10 of the '693 patent on the basis that the FSS does not use a single-pass method or qualify as a single-pass system.  As noted earlier, defendants raise an additional ground for this result, and in the interest of completeness in this complex case, the court will also address that ground.

　　　　　　　　　　　　　　　　B.  *Inclusion of Receiving Bins*

　　　　Defendants aver that they are entitled to summary judgment of no infringement on the ground that the FSS does not contain any "receiving bins" capable of being emptied "if and when a mailpiece having a new unassigned mailstop is identified."  Defs.' Mot. at 19; *see also* Hr'g Tr. 8:11-14.  In defendants' view, the blue plastic trays into which mailpieces are deposited do not

16

qualify as "receiving bins" under the court's interpretation outlined in its claim construction because they are "*never* emptied if and when a mailpiece having a new unassigned mailstop is identified" but rather are removed only when they are full or after an entire pass is completed. Defs. Mot. at 19 (emphasis in original); *see also* Defs.' Reply at 2; Defs.' Mot. Ex. 15, at 4810 (Software Design Description for FSS (Feb. 16, 2011)) ("Once the output bin is full, the [blue plastic tray] is ejected and sent toward the staging area. The ejected trays remain in the staging areas until all the mail has been fed for the pass and has dropped into the output bins."); Hr'g Tr. 24:7-9 (defining "full" as having "all of the mailpieces that [the blue plastic tray is] going to hold").

Plaintiff observes that nothing in the court's claim construction limits a receiving bin to any particular shape or requires that it be entirely enclosed. *See* Pl.'s Opp'n at 23. Accordingly, plaintiff avers that the combination of blue plastic trays and the rail system, including the place-and-transfer device upon which the trays rest, qualifies as a receiving bin because the trays can be emptied, much like a "trash bin that contains a trash bag [where] [t]he trash bin may not directly touch any of the trash deposited into the bin." *Id.*

The court in its claim construction interpreted the term "receiving bin" to mean "a container or enclosed place that serves as a collection point for sorted mailpieces." *Cormack III*, 119 Fed. Cl. at 73. Additionally, Claims 1 and 10 in the '693 patent provide further context regarding the role of receiving bins within the patented system.[23] Claim 1 states:

> A method for sorting mailpieces in a single pass . . . wherein *if and when* all of the plurality of receiving bins have been assigned with a mailstop and a new received mailpiece is identified with a new mailstop that has not been assigned to a receiving bin, the method further compris[es] the steps of i) issuing a command to a first receiving bin to empty its contents whereupon *the first receiving bin empties its contents* into a receptacle,[24] ii) *reassigning the first receiving bin with the new mailstop* of the new received mailpiece, and iii) conveying the new received mailpiece into the first receiving bin.

'693 patent, col. 8, lines 28-53 (emphasis added).

---

[23]The '693 patent's preamble also offers insight into the role of the receiving bins within the system. *See* '693 patent, col. 2, lines 20-25 (describing an embodiment of the system in which "[i]f and when a new mailpiece is received and scanned with a new mailstop that is different from the mailstops already assigned to each of the receiving bins, the control system then makes a determination as to which of the receiving bins is to be emptied of its existing contents of mailpieces and be reassigned with the new mailstop.").

[24]The court construed separately the term "receptacle" in its claim construction, concluding that it meant "a receiving container distinct from receiving bins." *Cormack III*, 119 Fed. Cl. at 76.

Correlatively, Claim 10 states:

A system for sorting mailpieces in a single pass, comprising . . . a control system . . . wherein the control system is . . . adapted to *transmit a command to a first receiving bin to empty its contents if and when* the scanning apparatus identifies a new mailpiece having a new mailstop after all of the receiving bins have been assigned a mailstop different from the new mailstop, [*and*] *to reassign the first receiving bin with the new mailstop* and to cause the conveyor apparatus to carry the new mailpiece to the first receiving bin and deposit the new mailpiece into the first receiving bin.

'693 patent col. 9, lines 12-48 (emphasis added).

Plaintiff's observations concerning the shape of the blue plastic trays and their supportive rails do not address defendants' argument regarding their functionality.[25] While plaintiff may be correct that the physical structure of the FSS's blue plastic trays and the rails upon which they rest could collectively qualify as an "enclosed place that serves as a collection point for sorted mailpieces," *Cormack III*, 119 Fed. Cl. at 73, the evidentiary materials submitted by the parties suggest that the trays do not act in the manner of "receiving bins" as described in Claims 1 and 10 of the patent because they are never emptied and reassigned to a new mailstop during a pass, but rather are emptied only when full or after the completion of one of the FSS's two passes of mail. *See*, *e.g.*, Defs.' Mot. Exs. 1, at 1807 ("During pass 2, as [blue plastic trays] fill up with sequenced flats, they are ejected from the FS[S] and transported to tray staging.") & 17 (Automated Tray Management Subsystem) (depicting transfer of empty blue plastic trays to output locations); Defs.' Reply Ex. 3, at 81:6-8 (Dep. of Cathryne Tondreau) (noting that trays are ejected from the output "[w]hen they are full or on sweep"); Pl.'s Opp'n Ex. 2, at 80:7-12 (Dep. of Leung Shiu) ("A tray is ejected when it is considered full during the run and also during the sweep at pass one and pass two . . . ."); *id.* at 10 ("*When the bin is full*, the [system] . . . ejects the contents of the bin . . . .") (emphasis added); *id.* at 11 ("[T]he receiving bins of the FSS eject their [blue plastic trays] when the control system senses that the [blue plastic trays] *have reached their filling threshold*.") (emphasis

---

[25]Plaintiff also raises the alternative argument that the FSS components satisfy the receiving bin limitation under the doctrine of equivalents because "[t]he *function* of both the claimed receiving bins[] and the bins of the FS[S] is to serve as a collection point for sorted mailpieces during a sorting pass" and "[t]he *way* in which both bins perform[] this function is by providing a physical barrier around the sorted mail that prevents mailpieces from intermingling with mailpieces from other sorting destinations or from leaving their collection point until an eject command is received." Pl.'s Opp'n at 25 (emphasis in original). This argument, like plaintiff's other arguments, fails to address the receiving bins' dynamic role in the sortation process as outlined in the text of Claims 1 and 10 of the '693 patent.

added); Hr'g Tr. 74:16-18 (It's very clear here . . . that . . . the triggering event for ejecting the blue tray is that the tray is full.").[26]

Accordingly, there is not enough evidence in the record for the court to infer that any potential reassignments of the receiving bins to new mailstops occur "*if and when* all of the plurality of receiving bins have been assigned with a mailstop and a new received mailpiece is identified with a new mailstop that has not been assigned to a receiving bin," '693 patent, col. 8, lines 41-44 (emphasis added), or *could* occur "*if and when* the scanning apparatus identifies a new mailpiece having a new mailstop after all of the receiving bins have been assigned a mailstop different from the new mailstop," '693 patent, col. 9, lines 40-44 (emphasis added). In addition, there is no evidence that the FSS contains any other structures that are capable of collecting mail and being reassigned to new mailstops during a pass. The ability of the receiving bins to be reassigned dynamically during a pass is central to plaintiff's invention and serves as its primary distinguishing feature over prior art. *See, e.g.*, Compl. ¶ 5 ("The [']952 Application [that culminated in the issuance of the '693 patent] disclosed pioneering technology, invented by [Mr.] Cormack, underlying the dynamic assignment of mailstops and receiving bins for use in automated mail sorting systems."). The lack of evidence demonstrating the FSS's ability to reassign receiving bins to new mailpieces during a pass of mail ultimately defeats plaintiff's assertions of infringement with regard to both the system and method claims contained in Claims 1 and 10 of the '693 patent.

In sum, because defendants have met their burden of demonstrating the absence of any genuine issue of material fact with regard to how the accused FSS machinery operates, summary judgment is appropriate. *See Matsushita*, 475 U.S. at 587-88. The court finds that the FSS fails to sort mail in a single pass and is incapable of sorting mail in a single pass. The court also finds that plaintiffs have failed to demonstrate that the FSS includes "receiving bins" that act in the manner depicted in Claims 1 and 10 of the '693 patent.[27]

---

[26]Plaintiff contends that the deposition of Mr. Leung Shiu, a Postal Service employee, demonstrates that the receiving bins can be dynamically reassigned to new mailstops. *See* Pl.'s Surreply at 3-4; *see also* Hr'g Tr. 56:21 to 57:20 (citing Pl.'s Opp'n Ex. 2 (Dep. of Leung Shiu), at 55:8-16 ("Dynamic overflow bin occurs on the second pass. You can imagine, if a [mailpiece] is going to one of these bins and, for instance, *if a bin fills up, they get rejected*, they get replaced by another bin. If you can imagine another piece that's *destined for that same bin*, it needs somewhere to go. So the system is smart enough to assign another bin so that that piece can get to its destination . . . .") (emphasis added)). The court's interpretation of Mr. Shiu's statement differs from plaintiff's. Given that Mr. Shiu specifically referenced a mailpiece "destined for the same bin" as the one that was ejected because it "fill[ed] up," there is not enough information in Mr. Shiu's statement for the court to infer that the replacement bin could be assigned to a *new* mailstop during a pass.

[27]It is not necessary for the court to consider the dependent claims at issue because "[i]t is axiomatic that dependent claims cannot be found infringed unless the claims from which they

**CONCLUSION**

For the reasons explained, defendants' motion for summary judgment is GRANTED because the court concludes that the FSS does not infringe claims of the '693 patent. The clerk is directed to enter judgment for defendants.

No costs.

It is so ORDERED.

                                            s/ Charles F. Lettow
                                            Charles F. Lettow
                                            Judge

---

depend have been found to have been infringed." *Wahpeton Canvas Co. v. Frontier, Inc.*, 870 F.2d 1546, 1553 (Fed. Cir. 1989).